I'll rise. This court resumes its session. Let's try again. Counsel ready? Yes, Your Honor. Good morning. My name is Edward Dietrich, and I represent lead plaintiff Milton Arbitrage Partners. I would like to reserve five minutes for rebuttal. You may do so, but that talk will help you. You watch your time, but we'll try to help you. Yes, Your Honor. What could be more misleading? In order to boost international revenues, defendants paid bribes to foreign officials in cash-sealed envelopes, essentially putting the money in paper bags and telling investors that the growth in international operations was due to legitimate business reasons and strategies. You know, I read your brief, and I know how you, just like now, you emphasize bribes. The opponents would say they were paying commissions. And I know you've used the bribes. But we look, and we look at the facts, and we see what we see. And what we see here is how much money changing hands. Does that make a difference? No, I don't think it makes a difference, Your Honor. Whether you want to call them commissions or bribes, I think commissions I know, but as we try to classify it, assuming it's our duty to do so, do we consider the amount of money that changes hands, whether it changes in an envelope, cash, or whatever way? Do we look at how much and what percentage that is of the return? Well, I think the method of payment is important because it shows that they were doing something wrong. A corporation of this size would not pay a legitimate payment in cash. You see, you're making an assumption. Has TriEffect made that finding? Well, I think at a motion to dismiss No, but if you're dealing with a foreign government, there might be any number of reasons why you're paying United States cash rather than in their currency. Well, I think that when you look at the allegations and you look at them in the light most favorable to the plaintiffs, and you look at, for example, the allegations from CW2, confidential witness number 2, I think it's clear from those allegations that the defendants were doing something wrong, that they accounted for the commissions or the bribes or however you want to call them as marketing expenses. That was an intentional violation of generally accepted accounting principles and violated Section 13 of the Exchange Act. When you're looking at the amount, the fact that, you know, whether it's $400,000 or each payment is 10 to 20 percent of the sales, I don't think that if you want to say, oh, it's only a small amount, I don't think that that matters. I think what matters is what they were telling the investment community, what they were not telling the investment community, and the impact that the payments had on the foreign operations. Does that answer your question? Yes. You know, I think that the scheme here was so misleading that in our opening reply briefs, we give the Court seven different tests for determining whether the statements were false or misleading as set forth in controlling Ninth Circuit or other well-settled case law. And if I could, I could just list the seven, and if you want to discuss them, we can. But looking at any one of these tests or analytical frameworks or standards, you will come out and say that the statements made were misleading. So we plead inconsistent contemporaneous statements or information, and that's a test laid out in Glenfed, Ronconi, and Oracle, for example. We lay it out as the test of we meet specific problems undermining defendants' optimistic claims. We meet the test set out in Dow that there are specific allegations of direct involvement in intentional manipulation of accounting principles. We even give you Hornbook law that says revenue generated by illegal means is, by definition, material and misleading. We give you cases on the nature of bribery itself. In fact, the Sixth Circuit and Hulig v. Vencore and Grebel identify bribery by a top company official as probative of securities fraud. But sort of getting back to the question you're asking as well, the payments themselves do not have to be illegal for the statements to be misleading. They don't have to be bribes. Because attributing financial performance to the wrong source is misleading. And examples of those cases would be Providian and Campbell Soup and In Re Par Pharmaceuticals. And similar line of cases, In Re Time Warner and Cronfield, is when a corporation announces a specific business goal and a strategy for attaining that goal, but goes about attaining that goal in a different manner, those statements are misleading. Now, in terms of Sienta, we also give you seven types of evidence that some standing alone are enough, but certainly in combination meet the required state of mind. Again, the scheme itself, bribery, is powerful evidence of Sienta. The detailed contemporaneous conditions. The information provided by the confidential witnesses supports a strong inference. The findings by the SEC and the Department of Justice and Syncort's criminal plea. Syncort's gap violations demonstrate Sienta. And all that is bolstered by the insider trading, which was unusual and suspicious, and motive and opportunity allegations. Now, I think the, you know, one of the main issues here was the interpretation of Brody v. Transitional Hospitals. And I think that the district court got it wrong, misinterpreted that case. And I think that could be illustrated by an example. In Glenfed, Glenfed laid out the landfill example where the seller of the house assured the buyer of the house that the house was in perfect shape when, in fact, the house is built on landfill. And Glenfed, Ninth Circuit, using that example, said that's misleading. The seller of the house did not have to say to the buyer, the house is not built on landfill for the statement to be misleading. And that's essentially what the district court required us to do. Now, let me give you a similar kind of example of where it's more like what was in the Brody case. In Brody, there was a press release that said we have a stock repurchase program. And the press release was true. Plaintiffs did not allege that that statement was false or misleading. Plaintiffs said, well, but you didn't give us other information that you had received potential interest in companies coming in and buying the company. Then the — in Brody, the court — the company issued a second press release where they did announce that there was interest in the company, but plaintiffs still complained saying, well, there's other details that you didn't provide us with that we would have wanted to know. And basically what the Brody court said, no, this is not misleading because the statements were true and the statements are merely incomplete. The — what — they didn't have a duty to tell you that information and the — and the statements were not misleading. And what the Brody court does then is say, well, if the press release had said that there was no interest in a merger or we had not received any bids for the company, that might have been misleading. And that's the sentence, I think, that the district court takes out of context. It's not even apples and oranges. I can't even think of an analogy that's so different. It's like apples and baseballs. The — to track the Glenfit example, what Brody is like is a buyer is selling the house. I'm sorry. The seller is selling the house. And the seller tells the buyer that the house is in perfect shape, and it is. The house is in perfect shape. And the — the house gets sold to somebody else. And the buyer comes in and says, well, wait a second. You know, you didn't tell me that there were other bids. I wanted the house, or you didn't tell me about the number of other bids. And that's what the type of situation that Brody is dealing with. You're dealing with an omission where the statement itself, the representation about the house being in perfect shape is true, but there's other information that maybe the — the buyer would have wanted to know. And you could conceivably say — see the court saying in that example, well, maybe if the seller said there are no other bids, or I'm not accepting any other bids, or I'll hold the process open for you, then the — the buyer of that house might have a — have a cause of action. And I think that when you — you look at — at Brody and the case cited McCormick, and McCormick analyzes and cites Basic, and then you go back and look at Basic, I think it's clear that that's the type of situation that Brody is referring to, and the district court erred by applying the Brody type of situation of where the statement is not false or misleading, and applying it to a case where we are alleging that the statements are misleading and materially misleading, and, in fact, we give you seven different standards to show how the statements are misleading. No. I'm listening. Okay. Does Your Honors have any questions? I have none at the moment. No. If you'd like, we can reserve the time for rebuttal. I'll reserve the time for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the Court. My name is Dan Floyd. I represent Syncor Corporation and nine of the individual defendants. Mr. Waxman, who represents the outside directors, I'm going to give him three minutes of the time. Did the Court, in reaching its result, have to necessarily ignore the testimony of the confidential informant? No, Your Honor. I don't believe so. And I believe that it was only confidential witness four who the judge did not consider. But confidential witness two was discussed in events, had about a single meeting in 1998, unspecified time, where I don't believe that if the issue were whether that meeting showed a strong inference that people believed the company was acting illegally, I don't believe that the discussions of the evidence that was in that, contained in that confidential witness's statement would be sufficient. You have somebody supposedly turning red in response to a question or a statement. There's no direct statements of anything, of anything, that meeting would suggest that people believe what was going on was appropriate, or at least not inappropriate. Why are they plead guilty, then? Well, I believe that what happened eventually is when Cardinal Health decided to buy the company, there was further investigation done and there were some concerns raised, a special committee was formed, at which point I believe the company wanted to resolve the problems, went to the government and negotiated out a settlement. That does not in any way create an inference that at the time that events were going on, that people believed that they were acting improperly. I mean, that happens sometimes, that people are. You're telling me that people will plead guilty to crimes that they're not. Your Honor, the old. And then they're stuck, aren't they? The guilty plea. It's supposed to be willfully, knowingly, and with intent. And you're telling me, well, they really didn't know about it. Well, let me raise it. The guilty plea was to the international sub only, Sincor Taiwan. Fine. Okay. There were no individual guilty pleas of anybody. There's nobody that is tied to Sincor Taiwan. Still intentionally, knowingly, and willfully. Well, not the issue is not that you have to know that you're violating the law. In this instance, what happened here where the payments were being made to doctors, both the private and public hospitals, the issue was whether or not the doctors who were working at public hospitals were public officials. And there's no allegations, and there's no investigation that any of the payments being made to the private hospitals were considered illegal by anybody. So there's not any, if you go back, there's no specific case law that says that doctors are public officials. So what? They pleaded guilty to something, and they said that they knowingly, willfully, and intentionally violated the law. Not that they understood at the time that they were making the payments that they violated the law.  Well, that, we cited the second second case. But then they lied in their plea of guilty. It's a judicial admission that they lied in. That's what you want us to believe. I don't believe that. And I'm not going to believe it. No matter what you do, you can dance on the ceiling for all I care, you're not going to get that part through. Well, let me then address. I will, if I can, I'll make my argument on the aspects of why I believe there's not a securities fraud claim, regardless of whether or not somebody believes That may be. that there was illegal conduct, okay? This is not a case of financial fraud in the sense that there's no allegations that there are misrepresentations of revenues or profits, in which case if you miscite materially the amount of profits or revenues that you have, you may be subject to securities fraud. The issue is whether or not they had a duty to disclose those payments that were later determined, potentially by the company, to violate the FCPA, and which were later resolved with the government. Now, the plaintiff's theory of fraud is that this was all created back in 1998 as a scheme to drive stock price and executive compensation, and that it was not disclosed as a reason for their financial results. So the basis for the duty to disclose, because you do not, as a general matter, there may be a myriad of reasons for a large company why it has financial results. The basis for the duty to disclose here and the reason the stock price was allegedly inflated is that these explanations of, you know, the reporting of the results and the explanations given for the results were false, because they didn't include these commission payments. So then that leads you to the question of, well, when do I have to disclose whether something is driving my financial results when it's having a material effect on them? So here, the district court understood that and repeatedly asked the plaintiffs, explain why it is that these are why, what are your facts that these payments were in fact driving the results that were the foundation of your alleged scheme? So if you walk through some facts, and they couldn't do it and they didn't do it, and here's why. If you look at paragraph 8 of the Third Amendment complaint, they say the payments amounted to 10 to 20 percent of the revenues that were generated. Quote, these commission payments were generally 10 percent, could be as high as 20 percent of the gross revenue generated by the contract. Then they put actually in the complaint what they believe were the commission payments, which bounced up and down. So right there, if you're saying that this is a scheme to increase revenue during a period when the revenue was increasing, but yet the commission payments were bouncing up and down, how could that be the basis? But the amounts, the amounts are 94,000 and 2,000, 74,000 and 2,001. At the same time, the overall revenues were increasing. And this is, because it's a scheme to drive the stock price, it's got to be the entire company. It's got to be material in light of the overall performance of the company. But let's look at, so if you translate those amounts, the 74 and the 94, into revenue, based on the allegations in the complaint, we're talking somewhere between 370 and  The two years involved, CINCOR's overall revenue was 629 million in 2000, 775 million in 2001. So if you just do a simple math of the numbers in the complaint, it's incredibly modest. And then overall, you know, so it was not by accident that plaintiff's counsel came up here and suddenly started talking about the international business. But that's not a separate, it's part of the overall entity. The overall international business was limited to 6 to 7 percent of the overall revenue of the company. What, as you view it, as you view it, is the question that we're going to have to answer before we decide, as we decide whether to affirm or reverse? First, you need to determine whether or not there was a duty to disclose the payments from the statements that were made regarding the financial results. I believe central to that is a finding that the, in fact, they've pled sufficient facts to show that those payments were a material part of the results, such that the failure to disclose them would be false and misleading. And if, you know, so it's not every, it's not every. Kennedy. Doesn't 10b-5 say material in the question of the material misstatement of fact? It doesn't say the material in the results? But there has to be a. Was it by any misstatement of fact? You have to look at this. You have to look at a PSLRA requires that you look at an individual statement by statement basis. It has to make that particular statement, the specifics of that statement, material, materially false and misleading. Otherwise, you could, I mean, the plaintiff's standard would say that any time there is potentially, this is, this, at the time the statements were made, this was uninvestigated, uncharged, no, no, there was no government investigation of any kind, any notice, that any kind of uncharged illegal conduct that could be, that could be tied in any  That is not the law. That is not correct. Do we have to ignore the alleged statements made by the people from Syncor who were making the payments, that we are doing it this way for this reason, that we, whatever they said, I don't know the precise language, but you know. Well, the person, the person that was making the payments, that was alleged to have made the payments, was Moses Fu. He's not a, he's not, he was not somebody who was in any way responsible for any of the statements of the company. He worked in Syncor, Taiwan. So the one thing that the Court noted is that there was no allegations and no particularity that anybody else understood the way the payments were being made specifically in cash, which, by the way, is not an element of the FCPA. It doesn't make an FCPA violation either way. If it, pay by check, you can pay by wire transfer, you can pay by, it doesn't matter, it's not an element of the FCPA. But in this, on this record, there are some allegations of the reason that the money was paid in cash and there was envelopes stuffed with cash. Well. And there are allegations of the reason. Can the Court rule as a matter of law without ignoring that evidence? Well, I think in light, for a fraud case to exist, there has to be, you know, this isn't a fraud on the market case. The issue is you've got to have a claim that is inflating the stock price. They came up with a theory. There's just, it doesn't pay, there's no connection between the two. The issue that they've taken, they've presented is whether or not there was a scheme to drive the stock price by virtue of these payments, which presumably the theory is, is that, well, if you're generating revenue in something that creates legal risk, you ought to disclose it. But if that's not, if that's not what you're doing, I mean, you know, there are all kinds of potentially illegal conduct that occurs in corporations. If it's not tied to the financial performance or some material statement that you're making, then it's just something that you have to deal with. In the ordinary course of business, it doesn't create, in each instance, a Securities Act violation. And that's, I mean, that's basically the bottom line here. And so, and then you look at the motive and opportunity concept. Well, the motive and opportunity is because, presumably, you're not disclosing this because you want to preserve your ability to get bonuses and raise the stock price and sell your stock. If it's not increasing the money, the profits of the company, and it's not driving the stock price, then, in that case, there's no motive opportunity. The stock sales are meaningless. And even in this instance, you have the chief legal officer didn't sell anything during the class period. He's a defendant. The chairman sold 9 percent. The CEO sold on a regular basis, but sold only about 30 percent. So you don't have any kind of you have a four-year period where they're suggesting that every single statement made about a company that was generating, you know, $750 million in revenues was somehow rendered false and misleading because of $74,000 in commission payments that the company itself self-reported later to the government. I don't understand. It's not commission payments, commission payments or the amounts. It's I'm a stockholder in a company which is doing something crooked. They're going to get caught, and my stock is going to fall. Isn't that the normal reaction of a person who hears about this? My stock is going to tank. You don't think that that's what goes on? I bet your mind does. Well, what I would say, the Ninth Circuit specifically says that that is an omission. What you're saying is that the issue is whether or not in all companies there are a myriad of laws in all over the world that they have to deal with, and the notion that, I mean, one thing that they don't allege here are specific facts that suggest that anybody at the time they were making the payments that is relevant to the inquiry on a securities case believed that they were illegal at the time. And the ultimate plea agreement of the company doesn't establish the specific knowledge of any of these people. The Read-Write case in this circuit is very clear about what you do when you have later statements or later conclusions that come out, and when you can bring them back to the time that the statement was made and conclude that they were false when they were made or that somebody acted with scienter. It has to be very direct. And in this circuit, for an omission to be actionable, it must be affirmatively misleading. So, I mean, it has to be tied to a statement that is sending a message inconsistent with that. And to suggest that simply that every statement a company makes regarding its financial results contains an implicit affirmative representation that is violating no laws, I believe, is not appropriate. Kennedy, isn't there a statement included in the 13G statement, I think it is, 12G I believe, about that we're not, to the best of our knowledge or to the best of my knowledge, the company is not violating any law? It says that the company believes, it's a statement of belief, that is substantial compliance with all material laws relating to its business. So you have three layers of qualification. You have belief. So, first, they have to have allegations that that belief is not subjectively held at the time. Honestly held. And the only thing they have is the plea. And I respectfully disagree with Your Honor that I do not believe the plea establishes for any individual that they have the knowledge. How about the statements by the confidential witnesses? The confidential witness in 1998 simply said that somebody stated that they were making payments to doctors, and that, you know, looked over, somebody turned red. There was a statement in the elevator, we need to talk about this. There was no discussion about it. Whether or not that raises any inference at all, I don't know. But it certainly doesn't raise a strong inference under the PLSRA. And so you have a situation here. And in the section where, in the 10-K, in the section where these, where this statement of belief is made, you have a fairly lengthy discussion of what the company believes are the material laws relating to its business, none of which are implicated by the payments. So what you have to suggest is that, again, that statement is not a statement of guarantee or specific assurance that the company is never going to be found or will not be found to have been in violation of any law during that time frame. It represents a statement that overall the company is not aware at that time of some material issue relating to its compliance with the law. And there isn't an evidence that there is no specific pleading other than the fact that, subsequently, the company self-reported after payments were brought to its attention again by Cardinal Health, did an investigation, self-reported, and resolved it. This isn't something that came out the company itself had a moment, had a period where it actually looked at this, you know, formed a special committee later. It wasn't, you know, it's not consistent with somebody who is acting, knowing that it's acting illegally, and then suddenly one day gets up and says, well, do you have another form of special committee? So I think that the inference that at the time, and it's the plaintiff's burden here under the PLSRA to please particularized facts that show a strong inference that they did not subjectively hold the belief at the time. And there is really nothing other than the plea which, under the Rewrite decision and I believe under the Uris decision, are insufficient as a matter of law because they do not have as part of their, the FCPA does not require knowledge that you are acting unlawfully. You have to. The third amended complaint. Yes. Poses any problem for the argument? Does the what? The third amended complaint pose any problem for the argument that you're making? I don't believe, I mean, I believe my argument is based on what's in the third amended complaint. Well, would, were there allegations that at least three people who were making decisions knew that what they were doing was illegal? There were conclusory statements in that regard, but they have to be supported by particularized facts. And so they don't have anything that suggests that anybody said anything at the time that thought they were acting illegally. I really, I literally described from the 1998 meeting at this hotel virtually everything that's contained in that, you know, in the confidential witness 2's allegations. But even those don't turn it into a scheme of financial fraud to drive the revenues and profits of the company, which is the fundamental basis of the claim. I'd like to let Mr. Waxman have his time. Thank you. Thank you. Good morning, Your Honors. Eric Waxman, Skadden, Arp, Slate, Moore, and Flom. For the outside director defendants, Mrs. Oki, Wagner, and Ms. Lewinsky. Your Honors, I don't have a great deal of time, but I think the time I have is commensurate with the amount of time that the plaintiffs spend both in their argument and on their brief with respect to my clients. And I want to answer a couple of questions that the Court posed, one in a different argument, although repeated here, and then a specific question here. What is the narrow question that the Court has to decide in order to uphold the district court's ruling with respect to my clients? The answer to that question, Your Honor, is whether or not the second amended complaint, which was the only operative complaint with respect to my clients, pleads particularized facts showing a strong inference of scienter with respect to the outside directors. And in this circuit, of course, that is recklessness or conscious misconduct. And the answer to that question is that there are no facts that give rise even to a weak inference. A reasonable inference would not be enough. It must be a strong inference. But here there are no facts that give rise to a strong inference with respect to the outside director defendants. Your Honor, in plaintiff's argument before this Court was telling, they repeat yet again the same error that they made in their briefs before this Court and in the lower court. It is not by accident that they keep referring to, quote, defendants as a single wrongdoing monolith. That is impermissible. It was impermissible before the Reform Act, and it's even more impermissible after the Reform Act. Where is there any explanation of the role played by my clients in alleged misconduct? If you want to put it in a very simple, common-sense way, you can ask yourself, what did my clients know, and when did they know it? And the answer to that is they didn't know anything, nor should they have known anything until Cardinal Health discovered the questionable payments in connection with its due diligence. And what did my clients do? They immediately convened a special committee. They investigated the matter. They found a total, a total of approximately $600,000 of payments over a six-year period with respect to certain of the company's foreign operations. Now, the Court asked another question that I think was an outstanding question. Does the size matter? And with respect to my clients, the answer is absolutely. Because if you want to put it in language that is more typical in securities cases, were there any red flags? Well, the answer is clearly no. You had, if you look at 2002, Your Honors, you had less than 1% of revenues for foreign operations, which were labeled as marketing expenses. That's an ordinary and typical business expense. Less than 1% for 2002. On revenues for 2002, that was less than 6% of the company's overall operations. You have allegations of money being delivered in sacks. You have allegations of statements that were made at meetings. You have allegations with respect to budgets. Not a single confidential informant. There's not a single allegation within the complaint that says my clients were present at those meetings, were ever told of those meetings, that they ever received the budgets, or even if they had received the budgets, that they would have recognized that marketing expenses of a small magnitude should be read to be improper payments under the Foreign Corrupt Practices Act. So there is absolutely no evidence, none, no allegations, rather, that would suggest that my clients were aware or that they even should have been aware. And I want to make this point. I'm sure the Court understands it. These allegations wouldn't even satisfy a negligence standard. And we have a much higher standard than a negligence standard here. So — Kennedy, you're by your time. We permitted more time, which ate into what you had expected to have, and I was waiting for you to catch your breath before we stopped you. It wasn't happening. I think we understand. We've read your brief. I think we understand your position. Thank you, Your Honor. I just — I know the Court has read the briefs, and we went through the stock sales in great detail and explained why that did not give rise to the strong inference that it did. Thank you. Thank you. Thank you. We have rebuttal. Okay. Let me start with the outside directors. I thought you'd start with your strongest point. Well, I agree with you, Your Honor. I mean, the case against the outside directors is not as strong as the case against the other defendants, such as Montefiou and Bejerian and Funari. But that doesn't mean that the complaint does not satisfy the Ninth Circuit standards against these directors. And I think that if you look at the America West decision, that there's more here alleged against the directors than what was found — than what was alleged in America West, and that was — Tell us one, two, three, four, five. What did the outside directors do? What should they have known? And when? Okay. First, I think that they're asleep at the switch. The fact that Cardinal Health can come in, and in their due diligence, and they're not even in the company, discovered these payments and blew the whistle, I think that's red flag number one. Okay? When you look at the outside directors, Oki, for example, he's the brother-in-law of Defendant Montefiou. He's on the Compensation Committee, and the compensation, as we allege, is very important to the scheme. So the — so the Compensation Committee had to examine and approve the salaries and — for the executive officers. So that — so that's Oki. In addition, he made the statements. He signed the 10 rules. That's not Oki, as the record shows.  How do you get to Oki? No, it's paragraph 20G of the — Was — I thought you were — you were relying on the fact that Oki's brother-in-law was on the Compensation Committee. No, no. That's not what you — No, I'm sorry, Your Honor. Oki was on the Compensation Committee. All right. Okay. And in addition, you have his insider sales, and we go through the tables and a very Wagner, and again, they signed the 10-Ks, and he has the insider sales. And under Howard v. Everex, signing of those 10-Ks were the false statements is very important. And then you have Walensky, and Walensky is on the Audit Committee. And that's directly related because of the functions of the Audit Committee and the fact that Cardinal uncovered the payments and that they were accounting for the bribes as marketing expense. If the Audit Committee doesn't discover that, then, you know, I submit that that's severely reckless. And — Do you think the Audit Committee conducts the audit? No. The Audit Committee doesn't conduct the audit, but supervises the audit, supervises the outside accountants. And according to their proxy statement, the Audit Committee reviews the findings of the independent auditors, the accounting principles, the financial and accounting controls, and the SEC found that the accounting and financial controls were inadequate. So — and I also think that as a matter of policy, when you have a very, very specific complaint like we have here, and we have detailed allegations from confidential witnesses, you have the SEC, the DOJ, and real wrongdoing, intentional manipulation of accounting principles, that what the PSLRA was designed to prevent is not present here. The PSLRA would say, well, we're not going to allow the plaintiffs to go into discovery if they don't have particular allegations. Well, I would submit that at least when we have very, very particular allegations as to some defendants, the company is going to go into discovery, those defendants are going to go into discovery, and if the outside directors are going to go into discovery as well, whether as parties or nonparties. Now, in terms of — I think that the outside directors would rather go into discovery as nonparties. I think you're right. They probably would as well. Unless they heard something from the auditor from a CPA firm that gives them a red flag, you know, what have they done that's wrong? Where do you get the strong inference of knowledge that there's a misstatement? Well, from their insider sales and the very detailed allegations of the pervasiveness of the scheme involved, and the fact that Cardinal Health came in and in standard due diligence discovered the payments. So those would — that's what I would say would be the factors as to that. And again, looking at America West, where America West said, okay, the directors had so many meetings and attended so many meetings, and, you know, and that was enough. They just found it incredible that the directors wouldn't know of those pervasive problems, and I think that we have that here as well. Now, getting to — well, also, just very quickly, they're also liable under 20A as control persons. So once we have the primary violation, the directors should be held in under control person liability. Defense counsel was making this argument about the amounts of commissions went up and down and that the revenue did not exactly track the amounts of commission. First of all, if you figure out the commission payments as 10 to 20 percent of sales, as we do allege alternatively in the complaint, then you're going to have that direct relation between the amount of the bribes or the amount of the commissions and the sales. Secondly, when you look at paragraph 15 of the complaint, it's really the overall trend of the payments, and there's no doubt that if maybe you have some time delay or some small fluctuation that they're pointing out, I don't think that that really matters. The overall trend, and we have the detailed allegations from the — that the scheme accelerated after the meeting in Thailand in 1998, and the international business went up accordingly. And what mattered, as this Court said in Ronconi, what matters most to investors is whether — may I finish up, Your Honor? Kennedy, you can finish, Your Honor. Is whether sales are growing and whether sales are growing faster and faster. And the fact that the business was mature, it didn't matter that international was a small percent. The fact that mattered was that that's where the business was growing, and it was material, and the Court found as much as evidenced when the stock dropped when the scheme was revealed. Thank you, Your Honor. I thank counsel for the argument. The case just argued is submitted.
judges: Farris, Gould, Cff, Duffy